IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| CHAD STEVEN MORRILL,<br><br>Plaintiff,<br><br>vs.<br><br>ACADIA HEALTHCARE d/b/a HIGHLAND RIDGE HOSPITAL,<br><br>Defendant. | ORDER AND MEMORANDUM DECISION<br><br>Case No. 2:17-cv-01332-TC |

Plaintiff Chad Steven Morrill ("Chad")[1] filed this action in December 2017, alleging that his former employer, Defendant PHC of Utah, Inc. (doing business as Highland Ridge Hospital ("HRH"))[2] failed to reasonably accommodate his disability, wrongfully terminated him, and retaliated against him. HRH now moves for summary judgment on each of Chad's claims.

At the hearing, Chad's counsel, David Holdsworth, conceded that no triable issues of fact existed for the second or third causes of action. Accordingly, HRH's motion for summary judgment is GRANTED for those two claims.

On the other hand, for the reasons stated below, the court concludes that triable issues of fact exist for the first cause of action, and HRH's motion for summary judgment is DENIED for that claim.

---

[1] Because the plaintiff's parents, who share his last name, are key witnesses in this case, the plaintiff is referred to throughout as "Chad." Similarly, his mother is referred to as "Rhonda" and his father is referred to as "Dave." No disrespect is intended by the use of these first names.
[2] HRH was improperly named in the complaint as "Acadia Healthcare d/b/a Highland Ridge Hospital."

# I. BACKGROUND

Chad suffered an aneurysm and stroke in 2005 and now has both short-term memory loss and partial paralysis on his right side. (Rhonda Dep. I at 9:13-20:9 (ECF No. 19-3).) HRH is an in-patient behavior and addiction treatment center where Chad began working in 2012.[3] (Jensen Decl. ¶¶ 3-4 (ECF No. 19-2).) His job title was "dietary aide/dishwasher" and some of Chad's duties included delivering food from the kitchen to the patients' bedrooms, ensuring the kitchen remained stocked with food and supplies, washing dishes, and sweeping and mopping the kitchen. (Polatis Decl. ¶ 3 (ECF No. 19-6).) The parties dispute whether it was also Chad's job to sweep and mop the much-larger dining room. (Polatis Decl. ¶ 3; Chad Dep. at 12:1-13:12; 87:8-89:8 (ECF No. 19-5).)

In mid-2014, Logan Polatis became Chad's new supervisor and began requiring that Chad mop the dining room. (Polatis Decl. ¶ 1.) Because of his partial paralysis, this task was difficult for Chad. (Chad Dep. at 11:10-13, 62:14-17.) Over the course of several months, Mr. Polatis issued corrective action notices, a 30-day performance improvement plan, and ultimately a final warning to Chad regarding his deficient mopping. (Exs. 8 & 9 to Chad Dep.; Polatis Decl. ¶¶ 6-11; Jensen Decl. ¶ 5.) Because Chad's performance failed to improve, his employment was terminated on December 4, 2014. (Polatis Decl. ¶ 11; Jensen Decl. ¶ 6.)[4]

Chad brought this lawsuit on December 29, 2017. Among other things, Chad argues that HRH had an obligation to contact his parents to inform them of any problems he was having at work, because if they had known he was struggling, they could have arranged a reasonable

---

[3] Chad actually began working at the facility in about 2009. At the time, the facility was owned by another entity. After HRH acquired the facility in 2012, it kept Chad on as an employee. (Jensen Decl. ¶ 4; Rhonda Dep. II at 35:11-22 (ECF No. 19-4).)

[4] Some of these documents indicate Chad was also struggling with other aspects of his job, such as cleaning dishes and following "sanitation procedures." (Jensen Decl. ¶ 5.) But HRH does not appear to contend in its motion that these issues were serious enough to warrant terminating Chad. The court accordingly does not address them further.

accommodation for Chad.  As examples of possible accommodations, his parents suggest that Chad's mopping duties could have been eliminated, which had been done before Mr. Polatis became his supervisor; Chad's coworkers could have assumed some of his mopping responsibilities; or a job coach could have been hired to help Chad learn how to mop the dining room.  (Rhonda Dep. II at 11:19-13:15, 67:9-20, 74:15-21; Dave Dep. at 40:8-16 (ECF No. 19-7).)

Although not directly related to the claims in this suit, both parties also highlight an earlier episode that provides context for Chad's experience with HRH.  In July 2014, Mr. Polatis informed Chad that he was required to have a food handlers license for his job.  After several warnings and a brief suspension, Chad finally obtained one.  (Chad Dep. at 59:7-61:20; Rhonda Dep. II at 8:3-10:4.)  HRH highlights this episode as evidence that it had no malice toward Chad and was not discriminating based on his disability.  When a previous problem arose, HRH worked with Chad to resolve the situation over the course of several weeks, even though Chad could have been immediately terminated for failing to get a license.  (Polatis Decl. ¶ 4.)  Chad, on the other hand, points out that despite repeated warnings to get a license, his short-term memory loss prevented him from doing so.  Instead, the problem was only resolved when HRH spoke directly to Rhonda about the problem, who then arranged from him to get the license.  (Chad Dep. At 59:7-61:20; Rhonda Dep. II at 8:3-10:4.)  Chad argues that this shows that HRH knew that important information needed to be provided directly to Chad's parents and that, if kept informed, his parents were willing and able to help him keep his job.

## II.  LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." Tabor v. Hilti, Inc., 703 F.3d 1206, 1215 (10th Cir. 2013) (internal quotation omitted)).

"If the movant meets this initial burden, the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant." Talley v. Time, Inc., 923 F.3d 878, 893-94 (10th Cir. 2019) (internal quotation omitted). Should the nonmovant bear the burden of persuasion at trial, "[t]hese facts must establish, at a minimum, an inference of the presence of each element essential to the case." Id. (quoting Savant Homes, Inc. v. Collins, 809 F.3d 1133, 1137 (10th Cir. 2016)).

When evaluating a motion for summary judgment, the court must view the facts and draw all reasonable inferences in favor of the non-moving party. Tabor, 703 F.3d at 1215. But this is only true insofar as "there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–587 (1986)).

### III. ANALYSIS

The Americans with Disability Act makes it illegal for an employee to "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Discrimination on the basis of disability includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation

would impose an undue hardship on the operation of the business of such covered entity." § 12112(b)(5)(A).

> "In order to establish a prima facie case of failure to accommodate in accordance with the ADA, a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability."

Allen v. SouthCrest Hosp., 455 F. App'x 827, 830 n.2 (10th Cir. 2011) (quoting Kotwica v. Rose Packing Co., Inc., 637 F.3d 744, 747-48 (7th Cir. 2011).

HRH contends that Chad was not a qualified individual and that no reasonable accommodation could make him qualified. HRH does not address the second element, that is whether it was aware of Chad's disability.

1. Qualified Individual

An employee is a qualified individual if, with or without a reasonable accommodation, the employee can "perform the essential functions of the job." Mason v. Avaya Communications, Inc., 357 F.3d 1114, 1118 (10th Cir. 2004). The parties dispute whether sweeping and mopping the dining room were essential functions of Chad's job.

> "Essential functions" are "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). Evidence considered in determining whether a particular function is essential includes: (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the work experience of past incumbents in the job. 29 C.F.R. § 1630.2(n)(3); see also Wells v. Shalala, 228 F.3d 1137, 1144 (10th Cir. 2000).

Id. at 1119.

Most of the factors identified by the Tenth Circuit for consideration were not addressed by the parties' briefs. Neither party has submitted "written job descriptions prepared before advertising or interviewing applicants for the job." And the parties do not discuss how much

5

time, relative to other tasks, an employee is expected to spend mopping or sweeping the dining room. It is unclear whether each employee performed this task each shift or whether employees took turns mopping. And there is no evidence regarding what would happen to the other employees' workload if one employee was excused from mopping.

Instead, HRH addresses only the first factor and Chad addresses only the last factor.

First, regarding "the employer's judgment as to which functions are essential," HRH relies primarily on the affidavit of Mr. Polatis, which states:

> One of the positions at HRH I oversee is the Dietary Aide/Dishwasher position. The essential job functions of this job include assisting cooks with food deliveries; cleaning and sanitizing the kitchen, dining room, dishes, and utensils; monitoring and refilling dietary supplies; and performing other dietary-related assignments, as directed by me and other supervisory staff.

(Polatis Decl. ¶ 3.) HRH also submits the agendas from two staff meetings, in which dietary aides were given a lengthy list of tasks to perform, such as loading dish washers, placing mats on the floors, filling condiment dispensers, filling cereal dispensers, restocking pantries, preparing and delivering trays for patients who were bedridden, keeping the kitchen clean and organized, and wiping down tables, chairs, windows, napkin dispensers, and salt and pepper shakers. It also instructed aides to "[m]ake sure the floors are swept and mopped in the dining area, garbage area and serving area." (Ex. 7 to Chad Dep.) Chad confirmed that these agendas predated Mr. Polatis and that he was present at the meetings where they were distributed. (Chad Dep. at 51:8-54:25.)

Chad responds to this evidence by invoking the fifth factor, the "experience of past incumbents," and more specifically points to his own prior experience in the position. Chad argues that these two agendas and the declaration of Mr. Polatis are not determinative because for approximately two years, before Mr. Polatis became his supervisor, Chad was never required to sweep or mop the dining room. (Chad Dep. at 12:1-13:12; 87:8-89:8.)

6

This competing evidence is sufficient to raise questions of fact regarding whether mopping the dining room was an "essential" part of Chad's job. While courts are generally deferential to an employers' statements regarding whether certain conduct is an essential duty, that deference requires that the employers' actions be consistent with its statements. See Mason, 357 F.3d at 1119 ("We will not second guess the employer's judgment [regarding what counts as an essential function] when its description is . . . uniformly enforced.") (emphasis added). The sparse record before the court shows only that (1) Mr. Polatis viewed mopping the dining room as essential; (2) two documents described mopping the dining room as a task to be performed by dietary aides, although that document makes no distinction between essential or nonessential tasks; and (3) for two years, Chad was not expected or required to mop the dining room. None of the other factors are addressed by either party.[5]

Reviewing the evidence, the court concludes Chad's experience before Mr. Polatis became his supervisor is sufficient to raise triable issues of fact regarding whether mopping the dining room was an essential function of his employment and, by extension, whether Chad was a qualified individual.

    2.    <u>Reasonable Accommodations</u>

Even assuming that mopping the dining room was an essential function, Chad would nevertheless still be a qualified individual so long as he could perform the task with a reasonable accommodation. Here, the parties debate the sufficiency of three possible reasonable

---

[5] At the hearing, HRH emphasized the importance of having a sanitary and sterilized dining room in a hospital facility and contended that this demonstrated why mopping the dining room was such an essential function. The court agrees that cleaning the dining room is undoubtedly important. But the fact that this particular duty is important does not answer whether it is essential that Chad be the one to do that work.

7

accommodations: (1) notifying Chad's parents of his difficulties; (2) exempting Chad from all or part of his mopping duties; or (3) hiring a job coach.[6]

     i.     Notifying Chad's parents of any work discipline problems.

HRH concedes that "[a]t some point while [Mr.] Polatis was the Dietary Director, [Chad] requested that his parents be notified of any discipline he received." (Def.'s Mot. Summ. J. at 7.) Nevertheless, HRH argues that it did all that it was required to do to ensure Chad's parents received this notice.

First, HRH maintains that it never agreed to <u>directly</u> notify Chad's parents. Instead, HRH contends it satisfied its duty by giving information to Chad and then instructing him to relay the message to his parents. After all, "an employer is not required to always provide the employee with the best possible accommodations or in the specific manner the employee requested. It has broad discretion in determining which alternative accommodation should be provided." <u>See Selenke v. Med. Imaging of Colo.</u>, 248 F.3d 1249, 1261 (10th Cir. 2001); <u>see also</u> <u>Reynolds v. AutoZone, Inc.</u>, Case No. 2:17-cv-1319-TS, 2019 WL 3083064 *6 (D. Utah July 15, 2019) ("Defendant only needed to provide a reasonable accommodation, not one of Plaintiff's choosing.").

Given Chad's short-term memory loss, the court concludes it would not be a reasonable alternative to rely on Chad to convey information to his parents. Certainly, that should have been HRH and Mr. Polatis's experience after the food handlers license incident: telling Chad to tell his parents that he needed a license was not sufficient. But telling Rhonda directly was.

---

[6] Although both parties treat notifying Chad's parents as a possible accommodation in and of itself, notifying Chad's parents should more properly be viewed as a means to an end. Without his parents, Chad might not know that he has a right to a reasonable accommodation, might not know to request one, or might not be able to think of any plausible accommodations. With his parents' help, a reasonable accommodation might be found. Nevertheless, consistent with how the parties frame it, the court addresses the notification issue as a possible reasonable accommodation.

(Chad Dep. At 59:7-61:20; Rhonda Dep. II at 8:3-10:4.) Similarly, Dave testified that when either he or his wife picked Chad up from work, Mr. Polatis would tell them what Chad's schedule was for the next day. As Dave put it, "[Mr. Polatis] didn't trust Chad to remember his schedule, but then again, he trusted him to tell us that something was wrong at work? That don't seem right to me, when he had every opportunity to talk to us every day." (Dave Dep. at 14:17-21.) While HRH was not required to provide the "best" accommodation, it was required to provide a "reasonable" accommodation. Relying on Chad to get a message to his parents was not reasonable.

Second, HRH contends that even if it would have been better to speak directly to Chad's parents, the issue is moot here because Chad testified at his deposition that he did, in fact, give his parents the disciplinary notices he had received at work. (Chad Dep. at 56:17-57:14; 63:12-64:6.)

Both Rhonda and Dave testified that they never received copies of these notices and that Chad never otherwise informed them that he was being disciplined at work. (See Rhonda Dep. II at 17:19-18:5; 29:5-18; 79:1-83:18; Dave Dep. at 34:19-21; 45:22-46:8.) Generally, in a motion for summary judgment, that would end the inquiry: multiple witnesses have competing recollections of key events, so a jury must be called upon to weigh their credibility and decide what really happened. But here, HRH argues that because Chad is the plaintiff in the action, the court is required as a matter of law to accept his testimony over any other contradictory evidence.

None of the cases cited by HRH support this supposed rule, and in fact, each of the cases to some degree stand for the opposite proposition. First, in <u>Birdwell v. Glanz</u>, Case No. 15-CV-304-TCK-FHM, 2019 WL 1130484 (N.D. Okla. Mar. 12, 2019), the district court stated that it

9

would accept a plaintiff's deposition testimony as true while ignoring a contradictory statement made by the plaintiff's attorneys in their brief. Id. at *1 n.2. HRH emphasizes this portion of the opinion while ignoring that elsewhere in the same case, the district court disregarded part of the plaintiff's deposition because it was "belied by the medical records in this case." Id. at *3 n.5. In other words, the court explicitly confirmed that a plaintiff's deposition testimony need not always be believed over other evidence.

Next, in George v. Newman, 726 F. App'x 699 (10th Cir. 2018), the district court struck an affidavit from the plaintiff on the ground that it contradicted his earlier deposition testimony. Id. at 701-02. Notably, the Tenth Circuit declined to opine on the propriety of this decision, holding instead that it would affirm the district's courts overall decision "even if [it] factored [the plaintiff's] affidavit . . . into the summary-judgment calculus." Id. at 707. In other words, the George case neither affirmed nor overruled the district court's decision to exclude certain evidence that contradicted a plaintiff's deposition testimony.

HRH's final case, Rhoads v. Miller, 352 F. App'x 289 (10th Cir. 2009), does not support HRH's position. HRH characterizes Rhoads as a case where the "plaintiff's testimony [was] adopted as true for purposes of summary judgment despite contradictory witness testimony." (Def.'s Reply at 4 (ECF No. 21).) At the hearing on its motion, HRH emphasized that it was not suggesting that this was the primary holding of the case. Rather, HRH maintained that this conclusion could be surmised from certain dicta in the opinion. But any such dicta is unpersuasive, given other statements made in the same decision.

In Rhoads, the plaintiff sued a police officer for using excessive force. The plaintiff was an admitted alcoholic, who testified in his deposition that he could not clearly remember the events of the night in question because he was drunk at the time. Given his poor memory, the

district court disregarded the plaintiff's deposition testimony in favor of the officer's testimony, and concluded that even under the officer's more favorable recollection of the evening, there were triable issues of fact regarding whether excessive force had been used. Rhoads, 352 F. App'x at 290.

The Tenth Circuit affirmed the trial court's decision. In doing so, it noted in passing that the district court need not have excluded the plaintiff's testimony as it did because "[the plaintiff's] alcoholism and memory problems go to the weight of his testimony, not its admissibility." Id. at 291. This is the part of the decision that HRH cites. But nothing in the Tenth Circuit opinion suggests it was instructing the district court to credit only the plaintiff's testimony, to the exclusion of the officer's testimony. In fact, the Tenth Circuit explicitly went on to state in a footnote that the plaintiff's testimony should be viewed in light of the other witnesses' testimony:

> We recognize that Mr. Rhoads also testified that Deputy Miller was not one of the persons who had beaten him, but Deputy Miller admits to performing the arm-bar maneuver on Mr. Rhoads (which maneuver is generally in accord with Mr. Rhoads' description of an officer grabbing his arm and pulling him out of his wheelchair). In light of Deputy Miller's admission and Mr. Rhoads' admitted memory problems, a reasonable jury could believe that Mr. Rhoads was subjected to a beating, as he testified, while discounting his description of his assailant(s).

Id. at 291 n.2.

Here, like the plaintiff in Rhoads, Chad suffers from memory loss. This court agrees that, under Rhoads, this memory problem is not a basis, by itself, to simply disregard Chad's deposition. At the same time, nothing in Rhoads, or any of the other cases, suggests that the court must rely on Chad's recollection of events to the exclusion of other witnesses. On the contrary, Rhoads itself notes that a jury must determine how much weight to give the testimony of an individual with a poor memory. Accordingly, the court concludes that contradictions

11

between Chad's recollection of events and his parents' recollection of events is sufficient to raise a triable issue of fact regarding whether Rhonda and Dave ever received notice of Chad's problems at work.[7]

Finally, HRH contends that the above issue, regarding the propriety of using Chad as an intermediary with his parents, ultimately does not matter because on at least one occasion, Mr. Polatis did personally inform Rhonda of Chad's difficulties.

Rhonda testified that at some point in November 2014, a few weeks before Chad's termination, she picked up Chad from work and, as they were leaving, Mr. Polatis told her that "Chad's struggling mopping the floor, having a hard time mopping the floor." (Rhonda Dep. II at 42:21-43:9.) Rhonda then testified that in response to Mr. Polatis's concerns, she asked him "'Do you think it would help if I brought in a job coach? You know, I can bring in a job coach if he needs one.' And [Mr. Polatis] kind of just walked away and didn't say anything else." (Rhonda Dep. II at 42:2-7.)

The court concludes that it is for the jury to decide whether Mr. Polatis's statement sufficiently put Rhonda on notice of the problem. After all, while it appears Mr. Polatis did

---

[7] Even if the court were inclined to rely exclusively on Chad's deposition testimony, it would be difficult to do so because he often contradicts himself. For example, Chad testified that he was not required to have a food handler's license for his job, and then, after prompting from the attorney conducting the deposition, remembered that he did have to have a license. (Chad Dep. at 32:1-18.) Immediately after discussing the existence of an employee hotline and reading HRH's policies requiring that harassment be reported, Chad testified that there was no way for an employee to report harassment. (Id. at 46:5-50:12.) HRH highlights the portion of the deposition where Chad testified that he provided the corrective action notices to his parents, but immediately before making that statement, Chad testified that he did not even recognize the documents. (Id. at 55:7-17, 56:17-23.) Just two questions after testifying that he told his parents about his workplace discipline, Chad testified that he had not discussed it with them. (Id. at 56:20-57:3.) He testified that HRH fired him in July 2014 for not getting a food handler's permit, even though he was actually only suspended for that issue, and was not fired until December 2014. (Id. at 61:10-20.) Chad said that no one at HRH ever tried to help him improve his workplace performance, and then confirmed in the next question that there was a period of time when he was meeting weekly with Mr. Polatis to fix his performance. (Id. at 65:6-66:17.) When asked if he recognized a copy of his performance improvement plan, he testified that he couldn't remember ever having seen the document before, but then, in response to the next question, he testified that he remembered giving a copy of the plan to his parents. (Id. at 68:23-69:5.) Finally, when presented with his written termination form and asked to identify it, he said it was just a "verbal warning." (Id. at 72:11-16.) Given these discrepancies, it would be impossible for the court to accept all of Chad's testimony as true and disregard any contradictory testimony from his parents.

mention the issue to Rhonda, he never informed her of the seriousness of the problem. There is no evidence that Mr. Polatis told her about the corrective action notices or the improvement plan or about the likelihood that Chad would be fired just a couple of weeks later if his performance did not improve. In fact, Rhonda's follow-up question appeared to be an effort to understand the seriousness of the problem, and yet Mr. Polatis reacted by just "walk[ing] away." Because there is no evidence that Mr. Polatis informed Rhonda that Chad was about to be fired over the issue, the significance, if any, of this conversation must be determined by a jury.[8]

For all of the above reasons, the court concludes there are triable issues of fact regarding whether HRH properly attempted to reasonably accommodate Chad by informing Chad's parents of his difficulties.

ii. Exempting Chad from all or part of his mopping duties.

Rhonda and Dave claim that, had they been informed of his difficulties, they would have been able to arrange a reasonable accommodation for Chad at work. One accommodation they propose would be to either entirely exempt Chad from mopping the dining room (Rhonda Dep. II at 67:9-14; Dave Dep. at 39:20-40:4) or arrange for Chad and other employees to each mop a smaller section of the dining room so that Chad would never be required to mop the entire space (Dave Dep. at 40:8-17).

---

[8] HRH spends a section of its brief explaining why Rhonda's statement about a job coach would be insufficient to place HRH on notice that Rhonda was seeking a reasonable accommodation for her son. See Reeves v. Jewel Food Stores, Inc., 759 F.3d 698 (7th Cir. 2014) (holding that it was insufficient for the mother of a disabled employee to "suggest" hiring a job coach because her statement was "tentative" and she "did not press the issue, and did not ask again."). But the court need not reach this issue. For the reasons stated above, there are triable issues of fact regarding whether Rhonda was aware that her son might need a reasonable accommodation. If a jury concludes that she was aware, then HRH is likely correct that this statement was insufficient. But if a jury concludes that Mr. Polatis's comment to her was insufficient, and that Rhonda was not aware that Chad was having a serious problem at work, then she would have had no duty to present HRH with a possible solution to the problem, and her failure to properly do so is irrelevant.

HRH argues that, although it exempted Chad from this work for the first two years of his employment, it had no legal obligation to continue doing so because such an accommodation would be unreasonable as a matter of law:

> An employer is not required by the ADA to reallocate job duties in order to change the essential function of a job. See 29 C.F.R. Pt. 1630 App. § 1630.2(o); Gilbert v. Frank, 949 F.2d 637, 644 (2d Cir. 1991). An accommodation that would result in other employees having to worker harder or longer hours is not required. See 29 C.F.R. § 1630.2(p)(2)(v) (impact to other employees on their ability to do their duties is a relevant factor in determining the reasonableness of an accommodation).

Milton v. Scrivner, Inc., 53 F.3d 1118, 1124-25 (10th Cir. 1995)

The court notes that this limitation only applies if mopping the dining room was, in fact, an essential function of Chad's job. According to one of the regulations cited by the Milton court, "reallocating or redistributing nonessential, marginal job functions," may be an appropriate accommodation. See 29 C.F.R. Pt. 1630 App. § 1630.2(o). Because there are triable issues of fact regarding whether mopping was an essential function of Chad's job, there are also triable issues of fact regarding whether it would be an appropriate accommodation to simply exempt Chad from mopping duties.

Similarly, the other regulation cited in Milton states only that the impact of a proposed accommodation on other employees is a factor for courts to consider. 29 C.F.R. § 1630(p)(2)(v). Neither Milton nor the regulation it cites suggests that it is never permissible to reallocate some work duties; it is simply not permissible to reallocate duties in a way that makes other employees work longer or harder. Notably, HRH has submitted no evidence that its other employees did actually work harder or for longer hours during the time when Chad was excused from mopping the dining room. Absent such evidence, the most reasonable inference is that Chad's former supervisor equitably distributed certain tasks among all of the employees, even if each employee

14

did not necessarily perform precisely the same work each day, and that doing so neither impeded HRH's functioning nor harmed HRH's other employees. HRH does not explain why Mr. Polatis decided that such allocations were no longer possible, and provides no basis for the court to infer that the earlier arrangement was not working.[9]

The court also notes that HRH has not responded to Dave's suggestion that Chad might have been able to mop a portion of the dining room so long as he did not have to mop the entire space. HRH simply does not address whether or not this would be a feasible accommodation. Accordingly, the court concludes there are triable issues of fact regarding whether HRH could have reasonably accommodated Chad by exempting him, in whole or in part, from these mopping duties.

    iii.    Hiring a Job Coach

Alternatively, Chad (and his parents) argue that hiring a job coach for Chad would have been an appropriate accommodation.

HRH cites Miller v. Santa Clara Cty. Library, 24 F. App'x 762 (9th Cir. 2001) for the proposition that a job coach is not a reasonable accommodation. In that case, a mother proposed hiring a job coach to help her disabled son and the employer refused. The Ninth Circuit affirmed that hiring a job coach was not a reasonable accommodation. Id. at 763, 765. But critically, in making this determination, the Ninth Circuit noted:

> The record is clear that [the plaintiff] cannot perform without a job coach at his elbow and that he does not have the basic, rudimentary knowledge required for library work. "Reasonable accommodation" does not encompass within its meaning the use of an additional person to help the clearly unqualified who cannot perform on their own.

---

[9] Notably, HRH has submitted evidence that <u>after</u> it began asking Chad to mop the dining room, other employees were forced to work harder because they often had to redo Chad's unsatisfactory work. (Polatis Decl. ¶ 8.) It does not help HRH's case that the only evidence before the court suggests that the arrangement under Mr. Polatis, but not the arrangement under his predecessor, caused other employees to work longer or harder.

15

Id.

Here, by contrast, the record suggests that a job coach would be effective. Chad had previously worked with a job coach and the experience was successful. As Rhonda testified:

> [W]hen [Chad] first started there, he did have a really hard time sweeping and mopping [the kitchen]. It took me and the job coach working with him for a couple of weeks to figure out: How do we get under things to get them out? You know, so it ended up being, we sweep this small little area, we put it in the dust pan, we move to the next area. So after a month or so he – he could do it, you know, and he would know how to do that.

(Rhonda Dep. II at 13:7-15; see also Dave Dep. at 30:20-31:5.) In other words, in Miller, the employer had every reason to believe that a job coach would not be an effective means of helping the employee; the employee could not function without a job coach, so the job coach would effectively just be replacing the employee. Here, by contrast, there is enough evidence to create a question of fact regarding whether a few weeks with a job coach could have allowed Chad to perform his job independently and competently.[10]

Because there are triable issues of fact regarding both whether Chad was a qualified individual and whether he could have been reasonably accommodated, HRH's motion for summary judgment is DENIED for the first cause of action.

## IV. CONCLUSION

HRH's Motion for Summary Judgment (ECF No. 19) is DENIED for the first cause of action and is GRANTED for the second and third causes of action.

---

[10] Additionally, because Chad has disability benefits, Rhonda believes that like with the original job coach, HRH would not have been responsible for the costs of this accommodation. (Rhonda Dep. II at 42:21-43:2.)

16

SO ORDERED this 16th day of March, 2020.

                              BY THE COURT:

                              *Tena Campbell*

                              TENA CAMPBELL
                              U.S. District Court Judge